1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                      ---

4       THE HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

5

6

7    United States of America,          )

8                   Plaintiff,          )

9                                       )

10   vs.                                )    Case No.

11                                      )    EDCR 06-84(A)-VAP

12   Kirk Karl DeWitt,                  )

13                   Defendant.         )

14   _____   )

15

16

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                     Sentencing

19               Los Angeles, California

20               Monday, May 4, 2009

21

22   Pamela A. Batalo, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
 1   APPEARANCES:

 2

 3     FOR THE GOVERNMENT:      OFFICE OF THE UNITED STATES ATTORNEY

 4                             BY:  JOSPEH N. AKROTIRIANAKIS

 5                                 ASSISTANT UNITED STATES ATTORNEY

 6                             312 N. SPRING STREET

 7                             LOS ANGELES, CA  90012

 8

 9

10

11     FOR DEFENDANT:          LAW OFFICES OF JOHN N. AQUILINA

12                             BY:  JOHN N. AQUILINA, JR.

13                             3895 12TH STREET

14                             RIVERSIDE, CA  92501

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Los Angeles, California, Monday, May 4, 2009

 2                              4:33 p.m.

 3                               -oOo-

 4         THE CLERK:  Item 18, ED CR 06-84(A)-VAP, United States

 5   of America vs. Kirk Karl DeWitt.

 6         Counsel, please state your appearances.

 7         MR. AKROTIRIANAKIS:  Joe Akrotirianakis on behalf of

 8   the United States.  Good afternoon once again, Your Honor.  This

 9   is Anthony Negrelli.  He is a special agent with ICE.  He

10   investigated this matter, and I have a number of materials here.

11   So with the Court's permission, I would ask him to remain at

12   counsel table with me.

13         THE COURT:  That's fine.  Good afternoon.

14         MR. AQUILINA:  Good afternoon, Your Honor.  John

15   Aquilia on behalf Mr. DeWitt, who is present in court and in

16   custody.

17         THE COURT:  This matter is on the Court's calendar for

18   sentencing.  Are both sides ready to proceed?

19         MR. AKROTIRIANAKIS:  Yes, Your Honor, on behalf of the

20   Government.

21         MR. AQUILINA:  Yes, Your Honor.

22         MR. AKROTIRIANAKIS:  Prior to the case being called, I

23   handed up to the clerk a number of exhibits.  I think that we

24   can dispense -- I hope I'm not speaking too quickly.  I hope --

25   I think that we will not need to have a witness for these
```

1    exhibits, but we may, Your Honor.

2            THE COURT:  All right.  All right.  Has the Government

3    complied with the Victims Rights Act in this case?

4            MR. AKROTIRIANAKIS:  Yes, Your Honor.  I actually did

5    in this case submit a Victim Impact Statement because it's one

6    of the ones that are on file, and that was one of the series

7    recovered from the defendant's computer media.

8            THE COURT:  All right.  Are there any victims present,

9    to your knowledge, who wish to speak to the Court?

10           MR. AKROTIRIANAKIS:  I don't think so, Your Honor.

11           THE COURT:  The Presentence Report in this case was

12   disclosed on August the 28, 2008.

13           Mr. Aquilina, have you reviewed that with your client?

14           MR. AQUILINA:  Yes, I did, Your Honor.

15           THE COURT:  And, Mr. DeWitt, good afternoon.

16           THE DEFENDANT:  Good afternoon.

17           THE COURT:  Mr. DeWitt, have you seen the Presentence

18   Report in your case?

19           THE DEFENDANT:  I believe so, yes.

20           THE COURT:  All right.  Have you discussed it with

21   your attorney?

22           THE DEFENDANT:  Yes.

23           THE COURT:  In addition to the Presentence Report, the

24   Court has reviewed the addendum to it, which was filed on

25   December the 1st, 2008; the Government's Sentencing Memorandum

```
 1    filed on September the 16th, 2008; and the Government's response
 2    to the Defendant's Sentencing Memorandum and the request for an
 3    evidentiary hearing and a continuance that was filed on
 4    December the 3rd; the Victim Witness Statement that was filed on
 5    February the 10th, 2009; additional documents, including the
 6    documents from the Riverside Superior Juvenile Court documents
 7    filed on April the 30the; the Defendant's Sentencing Memorandum
 8    filed on November the 18th.
 9            Is this everything both sides have submitted?
10            MR. AKROTIRIANAKIS:  I filed another document on
11    Friday.  I can explain to the Court why it was so late.
12            THE COURT:  I believe I saw that.
13            MR. AKROTIRIANAKIS:  It's the declaration of Special
14    Agent Clemente from the --
15            THE COURT:  Yes.  I saw that.  Wasn't that the
16    April 30th document?
17            MR. AKROTIRIANAKIS:  I beg your pardon, Your Honor?
18            THE COURT:  Maybe I have the wrong date.  But I did
19    see the declaration of Agent Clemente.
20            MR. AKROTIRIANAKIS:  There are two things I filed last
21    week, just to be clear.  One included the two exhibits that were
22    from the Juvenile Court and the other one was the declaration of
23    Agent Clemente.
24            THE COURT:  His affidavit of -- with respect to his
25    opinions and -- his background, his expertise and his opinions
```

1    with respect to this case?

2              MR. AKROTIRIANAKIS:  Yes, Your Honor.  And with that,

3    it's complete.

4              THE COURT:  All right.  Does either side have any

5    objections to the Presentence Report other than what was

6    previously set forth in your respective papers?

7              MR. AQUILINA:  On behalf of the Defense, no,

8    Your Honor.

9              MR. AKROTIRIANAKIS:  No, Your Honor.

10             THE COURT:  There are a number of objections, so let

11   me go through those.

12             First, the Defense objects to Paragraph 10 in the

13   Presentence Report.  That's the statement that the defendant

14   lived with his parents and his minor daughter.  I would overrule

15   the objection.  Apparently at that period of time that the

16   Presentence Report is referring to, the defendant was still, at

17   least at times, working as a truck driver, so he wasn't always

18   home, but when he was home, from everything that's in the

19   record, he was living there, so I would overrule that objection.

20             Paragraph 19, that the Presentence Report states that

21   the defendant's parents remained as legal guardians because of

22   allegations of sexual abuse by the defendant.  That's as to the

23   defendant's daughter.  Having reviewed the documents from the

24   Juvenile Court, I would overrule that objection.  That's a fair

25   recitation of the state of the record from the Juvenile Court.

1       The defendant may have denied those allegations and

2   continued to deny them, but the Juvenile Court did, indeed, name

3   his parents the child's guardians based at least in part on the

4   basis of those allegations.

5       Paragraphs 27 and 44 through 54, those are -- that's

6   the objection to certain allegations against the defendant by

7   the mother of his child.  Again, I would overrule those

8   objections having reviewed the Juvenile Court records.

9       Paragraph 62, that the defendant was planning to open

10  a computer business in the future after this case, I would

11  overrule that objection.

12      Paragraph 63, statement that the defendant once

13  applied to operate a foster home and for a job at a school, I

14  would overrule that objection based on what was stated to the

15  Probation Officer.

16      I would sustain the defendant's objection to

17  Paragraph 78, although I don't think it's -- it's not necessary

18  for the Court's -- either the Guideline calculations or the

19  Court's rulings.

20      The objections to Paragraphs 88 and 89 I would

21  sustain.  That's regarding the tax liens in Oregon.  I just --

22  it doesn't really have much bearing here so I would sustain the

23  objection.

24      And then I would sustain the objection to

25  Paragraph 90.

1          Turning to my intended ruling, starting with the

2     Guidelines calculation, that the Court consults the Guidelines

3     and considers them as advisory in determining a reasonable

4     sentence.  While they are the starting point, they are -- and

5     one of the factors among the other 3553(a) factors to be taken

6     into account, they are not presumed to be the reasonable

7     sentence, as the Supreme Court has reminded recently in the

8     *Nelson* case, particularly at the trial court level -- are not

9     presumed to be a reasonable sentence.

10          The Guideline range in this case is 97 to 120 months,

11    calculated as follows:  The defendant's Criminal History

12    Category is 1; the Offense Level is 30.  The Base Offense Level

13    is 18 under 2G2.1 of the Guidelines.  Then there is two

14    additional levels, Offense Levels, upward adjusted for the

15    images of prepubescent children found, and then four levels

16    upward under 2G2.2(b)(4) because sadistic conduct is depicted;

17    two levels upward for the use of a computer under 2G2.2(b)(6);

18    five more levels because more than 600 images were found under

19    2G2.2(b)(7)(D); two additional levels upward because there are

20    especially vulnerable victims here.  There are two and

21    three-year olds depicted.

22          So we would then arrive at Offense Level of 33 minus

23    three levels for acceptance of responsibility, for Offense Level

24    30.

25          The parties' respective positions on sentencing:  The

1    defendant's position is that a sentence at either the low end,

2    that is, 97 months, or the high end, 120 months, would be

3    excessive and more than necessary to meet the goals, purposes

4    set forth in 3553(a).  So the defendant requests a sentence of

5    approximately 21 months plus 5 years of supervised release.

6            The Government's request is a sentence of 10 years or

7    120 months.

8            So turning to the 3553(a) factors, to consider whether

9    they support the respective sentences here suggested by the

10   parties, in making an individualized determination based on the

11   facts in the record before the Court and starting with the

12   nature and circumstances of the offense, I will start with the

13   argument that the defendant offers or the defense that he offers

14   that he was merely viewing the pornographic images because he

15   had been told by another member -- well, I think I heard it two

16   different ways.  One, that it was a family member who told

17   him -- no.  I'm sorry.

18           He was told by a member of a group that he belonged

19   to, the name of which escapes me, but something like the

20   American Family Rescue -- something like that.  American Family

21   Support -- that a family member of his might be a victim of

22   this -- of the -- might be depicted on child pornography, and he

23   was investigating that, and that was his -- the only reason that

24   he was viewing the child pornography.

25           The Court does not find this believable.  This is a --

1   the nature and circumstances of this particular offense, not the

2   possession of child pornography in general, but this particular

3   offense, and the Court has seen a number of -- a large number of

4   cases now involving this offense, both in trial and just at

5   sentencing, and so looking at this particular one, I would say

6   it's -- both in terms of the number and the type of images and

7   all the other circumstances here, I would put this at the more

8   serious end of what I have seen.

9           As the Government points out, we have over 300 movies,

10   including -- and I have to state on the record some things about

11   the nature and circumstances of the offense.

12           The Government has put forth in the papers a certain

13   amount of details, so I don't need to go into a lot of detail,

14   but there are very young victims here.  There is sadistic films

15   showing very young victims.  One that shows a brutal beating of

16   a naked and very young child, probably under the age of five,

17   who -- who's -- not acting but who is shown screaming in pain as

18   she is beaten while she is naked and is then sodomized.  There

19   is another with a very young girl who is being forced to have

20   intercourse with an adult male and who is crying in pain after

21   the assault, and I think it's enough to say that there are many

22   other images of very young girls and boys being penetrated,

23   sodomized with foreign objects, beaten, and having, as I said,

24   presided over -- I don't count, but at least dozens of these

25   cases, I -- this case is a very serious one.

1       And I appreciate the arguments that Defense counsel

2  has made about the nature of the Guidelines in dealing with this

3  offense and that certain upward adjustments seem to be made in

4  every case now.  For example, the computer, I agree; I don't

5  think I have had a single case that doesn't have the two levels

6  upward for the use of a computer.  On the other hand, not every

7  case that comes before the Court has this many images.  In fact,

8  just last week I had one that had less than a hundred images.

9  The defendant possessed less than a hundred images.

10       So this defendant had a large number of images, and

11  not every case that comes before the Court has sadistic images.

12  A lot of them don't.  So it's not automatic that all of these

13  adjustments come into play.  The computer adjustment, it does

14  seem to, but a lot of the other things that drive the Guidelines

15  sentence, which is only one of the factors here, do not always

16  come into play.  And when you turn to the 3553(a) factors and

17  look at the seriousness of the nature and circumstances of the

18  offense, these are things that age and the vulnerability of the

19  victims and what is shown, they -- those are not always present.

20  And looking at the individual offense here, keeping in mind that

21  these are real live children, this is a very, very serious

22  offense.

23       The history and characteristics of the defendant, he

24  may be in Criminal History Category 1.  He has not led a

25  formerly law abiding life.  There is credible evidence that he

1  inflicted violence on his former wife and on his children.  One

2  detail that struck me was the -- that the description of the --

3  of the -- well, I guess the generic term for it would be

4  domestic abuse, but there were two different persons who

5  described in the Juvenile Court records that I reviewed -- that

6  described the defendant engaging in precisely the same conduct,

7  and that is the causing of the damage to the victim's knee by

8  the twisting, holding the foot, twisting the knee until the knee

9  popped out, the conduct that was inflicted on the very young

10 children so that, according to the records, the social worker

11 interviews and all the other records, the sexually -- to call it

12 sexually inappropriate conduct is really a euphemism and an

13 understatement.  The sexually inappropriate conduct by the very

14 young children which caused one child to be removed from the

15 care of the defendant, I just don't agree with the statement

16 that this is aberrant behavior, and furthermore the aberrant

17 behavior adjustment is not available according to Guideline

18 Section 5K2.2(0)(A) because this is conviction of an offense

19 involving a minor victim.  So that is not available, in any

20 event.

21      The defendant did not accept responsibility early,

22 contrary to the argument here.  He was -- this case was indicted

23 on October the 10th, 2006.  The defendant did not plead guilty

24 until July 14, 2008, nearly two years later.

25      The defendant denies the conduct which resulted in his

1   daughter being taken from his custody, but the Court, the

2   Juvenile Court, found it sustainable.  And the defendant then

3   violated the order that he not have unsupervised time with his

4   daughter, which is of great concern.  The conduct -- the

5   sexually inappropriate behavior at a very young age, that was

6   cited by the Juvenile Court in its decision to terminate his

7   parental rights.

8          Turning to the factors at Paragraph 2 of 3553(a), that

9   is where the Court is called upon to impose a sentence that

10  reflects the seriousness of the offense, the need to promote

11  respect for the law and provide just punishment.  Again, this,

12  in part, goes to the argument raised by the Defense that the

13  Advisory Guidelines sentence unfairly punishes for the use of a

14  computer and the number of images because that's very common

15  behavior in this type of offense, and I think I have already

16  addressed that.  It's not always common as to the number of

17  images nor as to the type, and the type varies a great deal, as

18  well as the number of images, and the types of images seen in

19  this case in terms of the films and so forth is -- well, without

20  using an adverb, it is my job, and I have had a lot of these

21  cases, and the types of pornography possessed by this defendant

22  really falls at the more serious end of what I have seen.

23         So what sentence would afford adequate deterrence to

24  this sort of criminal conduct on the part of Mr. DeWitt as well

25  as to others?  The sentence that is suggested by the Defense of

1    21 months or less than two years I don't think would accomplish

2    that purpose, either as to this defendant or as to others, and

3    certainly I don't think would protect the public from further

4    crimes of the defendant in light of his history of domestic --

5    in light of the entire history here and in light of the kinds of

6    images and the number of them.

7          Turning to the need to avoid sentencing disparity, I

8    find that when it comes to this offense, possession of child

9    pornography, over the course of the last eight or nine years, I

10   would say that these offenses probably call for the greatest --

11   some of the greatest challenges about sentencing disparity

12   because there are few crimes that have as many factors to

13   consider where there are as many explanations offered where as

14   many things in a defendant's background come into play, where

15   the impact on the victims is as heart-wrenching and as

16   important.  But there are many things to consider in a

17   defendant's background.  And I have tried to consider all of

18   that here, but the defendant here has some serious health

19   considerations that I should have mentioned.

20         The Court has taken that into consideration.  There

21   seems to me in this case -- and, again, it is not always present

22   in -- with persons charged in this crime.  Many -- many

23   defendants charged with this crime have -- it appears in my

24   experience have an enormous level of remorse and shame.  In

25   terms of despair, these persons charged with either possession

1    or distribution of child pornography, there is an enormous range

2    of the -- in that particular aspect in the amount of

3    responsibility that's taken.

4         I would say that this defendant is on the extreme.  I

5    think he really hasn't taken responsibility.  He pled guilty,

6    but I just don't see remorse or a true -- any true signs of

7    taking responsibility which, in my view, is very important in

8    terms of fashioning a sentence that protects the public from

9    further crimes of the defendant and fashioning a sentence that

10   would adequately deter future criminal conduct, in terms of the

11   opinions of Agent Clemente, who has testified in other cases in

12   front of this Court, so that's very troubling.  But there is a

13   lot of material that's been presented to the Court.  If the

14   parties want to put on -- have an evidentiary hearing and

15   challenge or put on further evidence and challenge it, I would

16   be happy to give you the opportunity to do so.  But I have

17   considered very carefully everything that has been submitted.

18        My intended ruling is to sentence the defendant to

19   10 years based on everything that has been submitted.

20        Mr. Aquilina?

21        MR. AQUILINA:  Thank you, Your Honor.

22        Your Honor, I'm not sure if counsel indicated or

23   meant, when he said that one of the matters that he lodged with

24   the Court was Agent Clemente's declaration.  I didn't receive a

25   declaration.  What I received is a transcript from another

1    proceeding in which Agent Clemente testified.

2              I informed counsel that I would be objecting to that.

3    It was my understanding Agent Clemente would be here today, and,

4    in fact, the last two or three continuances have been on the

5    request of the Government to obtain witnesses and present

6    evidence to the Court to which we were repeatedly objecting or

7    not consenting to.

8              So it was my understanding we were going forward today

9    and that was Mr. DeWitt's request.  So it's my position that the

10   Court should not consider Agent Clemente's opinions or

11   declaration.

12             Also I have received early on in the proceedings a

13   number of redacted investigative reports from the State of

14   Oregon and the County of Los Angeles regarding investigations

15   that the Court has referenced and have been marked as exhibits

16   this afternoon.  And, again, I know the Court can consider some

17   hearsay, but based upon the objections that we have presented to

18   the Court, I would ask the Court not to consider those either,

19   primarily because especially the incidents in Oregon reflect the

20   same source, and the same source over and over is the

21   defendant's former and estranged wife during a very difficult

22   period, either prior to their separation or subsequent to their

23   separation.

24             THE COURT:  Well, Mr. Aquilina, as to the Oregon -- as

25   to the Oregon incident, you're talking about the one with the

1   teenage --

2          MR. AQUILINA:  There is a series, Your Honor.  There

3   is an incident in which it's alleged that his ex-wife was

4   assaulted.  There is an incident in which she alleges that her

5   son was assaulted.  There is an incident where two of three --

6   excuse me.  Three teenagers are alleged to have been assaulted

7   and two of them indicated they were verbally assaulted.  The

8   third simply said she felt uncomfortable around the defendant.

9          The last Los Angeles incident was where --

10         THE COURT:  The homeless woman being assaulted?

11         MR. AQUILINA:  Yes.  With the defendant.  So those

12  objections I have noted for the record and for the Court's

13  consideration.

14         Lastly -- and I think perhaps most importantly -- is

15  the Juvenile Court records.  As I understand it -- and I was not

16  a party or counsel to Mr. DeWitt in the juvenile proceedings in

17  San Bernardino County.  However, I have been informed that the

18  Government submitted a petition with no notice to the Defense or

19  any of the attorneys or any of the parties and obtained a court

20  order allowing them access to those records.

21         I'm also informed that the Court did not authorize the

22  use of those records.  Those records can be accessed under State

23  Welfare and Institution Code Section 827.  827 allows government

24  officials to obtain access to records with a court order and

25  allows use of those court records with a court order.  The Court

1    authorized access to the records, did not authorize use of those

2    records, and here they are attached as exhibits.

3            THE COURT:  When you say "use" -- excuse me.  When you

4    say "the Court," are talking about this Court or the Juvenile

5    Court?

6            MR. AQUILINA:  The Juvenile Court, Your Honor, that

7    authorized the release of those records.

8            Lastly, in regards to those records, the two documents

9    that I received copies of that were apparently lodged with the

10   Court and filed this afternoon are investigative reports

11   prepared by Child Protective Services.  They are not court

12   orders.  There is nothing in the documents I have received or

13   reviewed which reflect any court order.  It is correct and

14   Mr. DeWitt acknowledges that temporary guardianship was awarded

15   to his parents.  He also did not reside in the same household

16   but frequently and on a regular basis occupied that household.

17           It's also further reflected by the Court that his

18   parental rights were terminated.  My understanding is that has

19   never occurred.  And, in fact, a part of this court order was

20   based upon the failure of the child's mother to even appear in

21   court or file any responsive pleadings in court.

22           THE COURT:  That's what is reflected in the records.

23           MR. AQUILINA:  That is --

24           THE COURT:  They made efforts to find Ms. Chadwick and

25   she never responded.  Their efforts were unsuccessful.

```
 1              MR. AQUILINA:  Which is the same woman who made the
 2   criminal complaints and allegations in the State of Oregon.
 3              Your Honor, I would only address some of the
 4   factual --
 5              THE COURT:  Before you go on, let me -- I want to
 6   clear some of this up.  Let's address some of these objections.
 7              Mr. Akrotirianakis?
 8              MR. AKROTIRIANAKIS:  Yes, Your Honor.
 9              THE COURT:  Let's talk about the Juvenile Court
10   records first.
11              What's state of the -- what's the state of things as
12   to the Juvenile Court's order permitting use versus access?
13              MR. AKROTIRIANAKIS:  I'm not aware of specific
14   limitations on the use.  I can tell the Court, I am holding here
15   two court orders from the Juvenile Court that relate to the two
16   Juvenile Court files for which I had petitioned for the release
17   of certain documents.  I can tell the Court there -- it's a
18   difficult process to get those, and it's carefully guarded by
19   the Juvenile Court.
20              I made a petition.  I informed the Juvenile Court of
21   my intended use of the records.  I told the Court that I
22   intended to submit them to this Court, that I wouldn't disclose
23   them to any person without this Court's order.
24              I submitted a carefully tailored, I thought -- closely
25   tailored order to this Court which this Court signed permitting
```

1    one copy of the records to be shared with counsel, to be shown

2    to the defendant, and to be returned to the Government and to

3    the Court for destruction after the conclusion of these

4    proceedings.

5              THE COURT:  You have shown them to Defense counsel?

6              MR. AKROTIRIANAKIS:  I have provided them pursuant to

7    the Court's order to Defense counsel.  I am now, for the record,

8    providing counsel access to the court records.

9              MR. AQUILINA:  Your Honor, just looking, glancing at

10   the court order, which is a two-page form order signed by

11   Judge Slough, S-L-O-U-G-H, who I understand is a San Bernardino

12   Superior Court judge, in regard to where and under what

13   conversations the records can be disclosed, it's blank.

14             THE COURT:  The order is not filled in?

15             MR. AKROTIRIANAKIS:  I hand it up, Your Honor.  I

16   don't think there is any dispute about the content of the order.

17             THE COURT:  All right.  Why don't you hand it to

18   Ms. Dillard.

19             MR. AKROTIRIANAKIS:  As I read those orders,

20   Your Honor, it says, "As disclosed or as indicated in the

21   petition."  In the petition I indicated to the Juvenile

22   Dependency Court the use that I had intended to make of the

23   records.  It is as I stated in court this afternoon, and the

24   Court sent me those orders together with the records that I had

25   requested that it could identify from the file.

```
 1            With the Court's indulgence, I can see if I actually
 2    have a copy of the petition in which I explained all of that,
 3    although I'm not certain that I do.
 4            THE COURT:  I think I have it right here.
 5            MR. AKROTIRIANAKIS:  Yes.  That's correct, Your Honor.
 6    I provided it to the -- the addendum to this Court in an earlier
 7    filing.  I should also state that the defendant was given
 8    notice.  I gave notice to everybody who I could find who was an
 9    interested party.  I notified the defendant through his former
10    counsel in the Juvenile Dependency Court action.  I informed
11    Mr. Aquilina what I was doing before I did it, and he informed
12    me that he doesn't represent the defendant for those purposes,
13    which I believe is correct.  He would not be entitled to notice
14    through Mr. Aquilina also.
15            I also informed the guardians, their counsel, counsel
16    for the minor, and I believe that the Court then notified
17    everybody, in addition to all the people I notified, that it was
18    aware of.  I wasn't aware of everybody because I wasn't privy to
19    the records --
20            THE COURT:  You mean the San Bernardino court?
21            MR. AKROTIRIANAKIS:  Yes, Your Honor.  I don't mean
22    this Court.  The San Bernardino court, and there was a delay in
23    the disclosure of the records as explained to me by County
24    Counsel because the Court wanted to make sure that there was
25    enough notice so that anybody could file an objection to the
```

 1   disclosure of the records to the Government.  I wasn't -- I now

 2   know because the defendant filed an appeal of sorts -- I will

 3   put it on the screen, if the Court has it.

 4        KD, I imagine, is Kirk DeWitt.  I petitioned for the

 5   records, of course, in my official capacity as an Assistant

 6   United States Attorney.

 7        But based on this document, which I received in the

 8   mail last week from the Court, I understand that the

 9   Government -- that the defendant filed some sort of objection so

10   he obviously had notice.  I don't know what that objection was

11   because it wasn't served on the Government.

12        MR. AQUILINA:  Your Honor, if I may add a couple of

13   things.  First of all, the defendant's attorney in the juvenile

14   proceeding is Timothy Guhin, G-U-H-I-N.  When I was informed

15   that the Government had received the records, I contacted

16   Mr. Guhin.  He told me he did not receive notice.  In fact, the

17   Proof of Service that he had, once he obtained a copy of the

18   petition, was left blank and that the appeal was filed by

19   Mr. Guhin on Mr. DeWitt's behalf with the Fourth District Court

20   of Appeals, and in part my understanding from Mr. Guhin is the

21   basis of that appeal is lack of notice prior to the disclosure,

22   and there was no hearing on the petition that was filed, and

23   that the petition, as I saw the court order there -- the

24   petition simply stated that the following records may be

25   disclosed, those listed within the petition, not for the

1  purposes which are being utilized this afternoon.  Again, my

2  information is from Mr. Guhin.

3          THE COURT:  But for the purposes today, the -- when

4  this application back in January came before me for the

5  continuance, notice was given to the Defense that the Government

6  was going to seek the -- because before I would grant the

7  continuance, the Government had to persuade me that there was

8  grounds for it, which the Government did in great detail, and

9  that application was served on the Defense.

10         So for purposes of our proceedings, it's not up to me

11  to tell the Juvenile Court if there is good cause to unseal the

12  records.  That's up to the Juvenile Court.

13         But for purposes of the defendant's due process rights

14  here, the Defense was notified of the Government's request to

15  obtain the records.

16         MR. AQUILINA:  The Defense was notified of the

17  Government's intent to request the records, Your Honor.  Again,

18  I cannot represent Mr. DeWitt in the juvenile proceedings.  He

19  had counsel.  I contacted counsel.  Counsel says, "I have never

20  been notified."  I have also been advised for several months

21  that Agent Clemente would be here this afternoon.

22         THE COURT:  I am going to take up the Clemente thing

23  separately because that's another issue.

24         MR. AQUILINA:  I am just stating - the reason I

25  analogize that is I've been advised that the Government was

1  going do a number of things, including in one of the petitions

2  or applications for a continuance that the Government was going

3  to bring in one of the witnesses or victims from the Oregon

4  incident.  Again, we don't have that person.  So I can rely on

5  what the Government intends to do, but I'm not going to act on

6  what they are intending to do, only what they do.

7        THE COURT:  But you did receive the copies or were

8  notified that you -- the copies of the same records that the

9  Court reviewed from the Juvenile Court?

10       MR. AQUILINA:  Yes.

11       THE COURT:  All right.  So let's just keep on the

12 Juvenile Court records for a moment, and then I will turn to

13 Clemente and the Oregon records.

14       Do you wish to respond to what Mr. Aquilina said a

15 moment ago about the lack of an order from the Juvenile Court?

16 Just what we have in the records, according to Mr. Aquilina -- I

17 have to go back and look -- are many things but not the orders.

18 We have the first -- I believe we do have orders, but do you

19 wish to respond?

20       MR. AKROTIRIANAKIS:  I think those are orders, what I

21 just handed the Court.

22       THE COURT:  No.  I am talking about orders for

23 termination of parental rights, etc.  So I'll just state what's

24 in the -- the first document that was in the records that were

25 submitted to the Court was the social worker's report.  There

1  was a second social -- well, it was called the First Amended

2  Jurisdictional Report.

3          MR. AKROTIRIANAKIS:  Your Honor, many, many months

4  ago, actually when this matter was being prepared for trial, I

5  believe when Mr. Juarez represented the defendant, I directed

6  ICE and undertook myself to investigate these matters related to

7  allegations of the abuse of the defendant's minor daughter by

8  the defendant and other matters related to the defendant's

9  sexual interest in children.

10          The Court may recall that Mr. Juarez asked to be

11  relieved because his partner --

12          THE COURT:  Had represented the minor in the Juvenile

13  Court proceedings.

14          MR. AKROTIRIANAKIS:  Correct.  At the time,

15  Agent Negrelli and I went to examine the Juvenile Court's file

16  and were granted access to do so.  I am not familiar with how

17  those files are kept, but what I did was take what notes I could

18  of what documents were there because I knew then I needed to

19  petition for the release of the records in order to use them

20  before this Court.

21          So I asked for the release of what is Exhibit 6 in the

22  notebook before the Court.  That is the 1994 report because it

23  contained most of the -- of the factual allegations upon which

24  the Government relies in its position that the defendant

25  presents a danger.

1          Exhibit 7, the 2002 report, is submitted because it

2     recites that based on the allegations contained in Exhibit 6,

3     the defendant's minor daughter was removed from his custody, and

4     I'll refer the Court -- I will refer the --

5              THE COURT:  I have already reviewed that, Exhibit 6.

6              MR. AKROTIRIANAKIS:  Right.  So what this -- what this

7     report does, Exhibit 7, Your Honor, the 2002 report --

8              THE COURT:  I have also reviewed --

9              MR. AKROTIRIANAKIS:  Yes, Your Honor.  It says what

10    the orders are.  So while I don't believe there are orders

11    before this Court, these reports discuss what the -- what the

12    court's orders -- the Juvenile's Court's orders were.  That's a

13    long way of answering the Court's questions.  I had not ever

14    seen orders, but these documents reflect what the orders were.

15             The file that I was provided when I asked for the

16    Juvenile Court to review the file related to the defendant's

17    minor daughter or the minor who's discussed here were these

18    records, among others that were not especially relevant.

19             THE COURT:  Well, but the orders that you are

20    referring to would have been made as a result of the information

21    in this report.  So how can the reports -- I mean, I agree with

22    you, the reports do talk about the orders.  But they also talk

23    about allegations.

24             MR. AKROTIRIANAKIS:  Correct.

25             THE COURT:  So where are the certified orders?

1          MR. AKROTIRIANAKIS:  There were no orders that I saw

2    in the file that we were provided access to, Your Honor, and the

3    way it works, to obtain anything from the Juvenile Court file,

4    they say, "Tell us exactly what you want with specificity and

5    why you need it," and you need to identify the documents by

6    name.  So they say, "Look at the file and tell us what you

7    want."

8          THE COURT:  Well, then isn't it possible that what we

9    have here are social worker reports and recommendations, but the

10   Court did not order the things that the social workers were

11   seeking?

12         MR. AKROTIRIANAKIS:  No.

13         THE COURT:  How do we know that?

14         MR. AKROTIRIANAKIS:  Well, that's why I got these

15   specific two reports.  The 1994 report discusses specific

16   evidence of suspected physical and sexual abuse of the

17   defendant's minor daughter.  Exhibit 7 then says when discussing

18   the history of this case, that based on that other report, the

19   Court had ordered -- and I'm referring to Page 4 --

20         THE COURT:  I remember that.  It says that -- well, if

21   you look at Page 16 on page of -- of exhibit -- I guess it's

22   Exhibit 7 in the notebook, those are recommendations.

23         MR. AKROTIRIANAKIS:  Correct.  On Page 4 it indicates

24   that under additional legal history, it's describing the history

25   of this matter, Your Honor.  It says that, "This child has a

1   previous court dependency that lasted from 1994 to 1996.

2   According to computerized referral history records, father was

3   found by the Court to have physically and sexually abused," and

4   then it names the child.  "Please see copies of photographs of

5   the child, which are attached and incorporated by reference."

6           So the purpose of submitting this report to the Court

7   is because this was the record that was available to the

8   Government that indicated what court action had been taken based

9   on the other report, which is Exhibit 6.  It indicates that the

10  records are computerized.  And if the Court --

11          THE COURT:  It seems -- well, even our records are

12  computerized, but you could get a docket report that shows that

13  an order was entered, you know, a Judgement and Commitment

14  Order, for example.

15          MR. AKROTIRIANAKIS:  I don't know what the specific

16  procedures of the Juvenile Dependency Court were.  We went there

17  and asked to review the file.  They provided us access to a

18  file, and they said, "If you want to copy anything" -- "You can

19  look at this, but if you want to copy anything out of it, you

20  have to petition the Court."

21          THE COURT:  Well, I understand that, but it seems to

22  me that what you wanted was an order -- you wanted the order

23  saying that the defendant's parental rights had been terminated.

24          MR. AKROTIRIANAKIS:  I don't know that the defendant's

25  parental rights have been terminated, and I don't want to use

1   terminology that I'm not familiar with, Your Honor.  It says

2   here that there is a recommendation of no family reunification

3   with the defendant.

4         THE COURT:  All right.  Well, I -- the Court can --

5   the Court can and has reviewed the contents of the Juvenile

6   Court file, including -- so that's Exhibits 6 and 7 here, but

7   that was -- what's your -- you're giving me copies today in

8   terms of 6 and 7 or what was in the material that you previously

9   provided to Defense counsel.

10        MR. AKROTIRIANAKIS:  Yes, Your Honor.

11        THE COURT:  And I've reviewed that.  If there is an

12   objection to it on the basis that Defense wasn't told that it

13   would be used for purposes of sentencing, I will overrule that

14   objection because the ex parte application made back in January

15   gave ample notice and specific notice that those documents were

16   going to be sought for the purposes of responding to specific

17   arguments made in the Defense Sentencing Memorandum.  So that's

18   as to just those two.

19        Now, the other documents that -- let's talk about

20   Agent Clemente, and then we will talk about the Oregon and the

21   Albany records.

22        Agent Clemente -- has the Defense not seen the

23   declaration that was submitted?

24        MR. AKROTIRIANAKIS:  I filed it with the Court's

25   E-filing system, Your Honor.  I can provide a copy to counsel if

```
 1   he doesn't have it.

 2            THE COURT:  That's all right.  That's one issue.  The

 3   other issue is that Agent Clemente is not available for

 4   cross-examination.  I am inclined to sustain the objection to

 5   Agent Clemente testifying by -- without the opportunity for the

 6   Defense to cross-examine his opinions and to cross-examine him

 7   on the opinions that are set forth in his declaration.

 8            MR. AKROTIRIANAKIS:  Your Honor, I think that that

 9   is -- and of course the Court can -- is within its discretion to

10   say, "I'm not considering that; I am considering this."  But as

11   far as the legal grounds upon which the Court can consider it,

12   the Court can consider Agent Clemente's declaration, even in the

13   absence of cross-examination.  That's routinely done at

14   sentencing.

15            THE COURT:  But this sentencing was continued a number

16   of times over the defendant's objection -- at least once, if not

17   twice -- for the purpose of getting Agent Clemente here.  Now,

18   as I recall, although it's been, I think, two years, but

19   Agent Clemente had some serious health issues, and I am assuming

20   that is why he can't travel because of -- you mentioned in what

21   you submitted with his declaration that he can't travel because

22   of the current fears of swine flu.

23            MR. AKROTIRIANAKIS:  Yes.

24            THE COURT:  And his own fragile health.

25            MR. AKROTIRIANAKIS:  I don't mind amplifying on that
```

1   before the Court and the public who are here.  I would ask that

2   the Court seal this part of the record.

3           THE COURT:  I don't know that we really need to get

4   into that.  He is not here for cross-examination.  I don't know

5   that his opinions are that important for the Court's sentencing

6   decision.  I read the declaration, but I don't -- I don't think

7   it really adds that much.  I think the record is complete

8   without it.

9           So given that the Defense feels -- well, Mr. Aquilina,

10  do you wish to say on the record the nature of your objection?

11          MR. AQUILINA:  Your Honor, the nature of my objection

12  is one is due process and that is in confrontation the right to

13  cross-examine the witness, the opinion of which this Court may

14  or may not accept and rely upon, as well as the basis of the

15  opinion.  So absent the opportunity to question the witness and

16  confront and cross-examine the witness, I think the defendant is

17  being deprived of those constitutional rights, as well as his

18  due process right to a fair sentencing hearing.

19          THE COURT:  Well, what -- what I -- what you may wish

20  to address, maybe both sides for just a moment, is as to

21  Agent Clemente, he not only gives in his affidavit -- he not

22  only gives some general information about investigations of this

23  type and defendants -- a profile of defendants accused of this

24  type of crime, but then he gives specific opinions based on the

25  evidence submitted in this case as to what he perceives as this

1   defendant's proclivities and danger to the community, and

2   that's, I think -- I think it might be a due process violation

3   in this case not to permit the Defense to cross-examine, so I

4   am -- that's why I am inclined to sustain the objection.

5           Do you wish to be heard further on that,

6   Mr. Akrotirianakis?

7           MR. AKROTIRIANAKIS:  No, Your Honor.  I think I can

8   argue based on the record as it is.

9           THE COURT:  All right.  Now, as to the other records

10  before the Court or that are proffered today, as to the -- I

11  have to say I haven't really considered -- I don't know that you

12  need to argue further because I haven't really considered the

13  information that was presented about the teenagers, the young

14  girls, the young women in Oregon.  That's not a significant

15  issue.  I mean, the Government may wish to argue it more and try

16  to persuade me.  That's not terrifically significant to me.

17          Some of the other things arising out of the

18  defendant's ex -- well, I don't know if they were married so

19  maybe it's not an ex-wife, but former relationship, I guess we

20  could say -- some of that I think I have considered in looking

21  at danger to the community and the allegations of abuse or

22  domestic violence in relationships.  So do you wish to be heard

23  on that?

24          MR. AQUILINA:  Your Honor, I will go off of the

25  records.  Certainly the Court can consider these reports.  The

1  question is how much weight should the Court give these reports,

2  which are reports by an estranged spouse or ex-girlfriend or

3  whatever the situation may have been at the time because there

4  is a series of reports over time where she labels herself as a

5  victim, she labels her son as a victim, she labels some

6  neighbors as victims.

7        Then what we have is those reports are apparently

8  filed somewhere in Oregon.  Albany, Oregon I believe is the

9  jurisdiction.  I don't know if there were ever any arrests.

10 There certainly were never any trials or convictions.

11       THE COURT:  I don't think charges were ever pressed in

12 any of them.

13       MR. AQUILINA:  That was my last thing.  I don't think

14 there were any charges ever filed.

15       What we have in one of the reports, I believe, is a

16 memorandum from the District Attorney's office who said, "I

17 don't think I can prosecute this case," and then we move those

18 same documents to San Bernardino County and submit those to the

19 Juvenile Court, and when Ms. Chadwick is notified to appear, she

20 doesn't show up.

21       Based upon all of that, there is a serious question of

22 the reliability.  The indicia of reliability, which is hearsay,

23 is minimal at best.  And I'm asking the Court not to consider

24 these documents because they're not -- there has been no

25 sufficient showing of reliability.  And that's what the

```
 1   confrontation and hearsay objections are primarily based upon,

 2   is reliability.

 3            THE COURT:  All right.  Mr. Akrotirianakis?

 4            MR. AKROTIRIANAKIS:  Well, I think that the

 5   reliability comes, Your Honor, from the corroboration of those

 6   allegations from multiple sources.  So, for example, you have

 7   the one -- the former cohabitant of the defendant, Ms. Chadwick,

 8   says that "the defendant abused me in this particular way," and

 9   then you have another victim of the defendant's violence against

10   women saying the exact same thing.  I mean, that would be

11   admissible under 404(b) in these particular circumstances to

12   prove the defendant's identity, and the reason why those would

13   be admissible at trial under that rule is because of the

14   evidentiary value that can be placed on that sort of

15   corroboration.  With the -- yes, it was the mother of the

16   six-year old boy in Oregon who reported to authorities that

17   defendant may be abusing the child, but the reports that we see

18   here are based on the statements of the child doing something

19   that a child of that age would not do unless they were shown --

20            THE COURT:  Now you are talking about the boy?

21            MR. AKROTIRIANAKIS:  Yes, Your Honor.

22            (Continuing) -- unless they were shown by an adult and

23   abused in the way that is described in these records.

24            THE COURT:  Well, with the boy it was not just the

25   acts.  It was -- I mean, he told -- he told adults about certain
```

1   things that he said that defendant had done to him, had hurt

2   him.

3            MR. AKROTIRIANAKIS:  That's correct, Your Honor.  This

4   is, by the way, the witness that counsel was saying more than a

5   few minutes ago now that the Government had said that this

6   witness was going be called.  This witness -- this victim was

7   one -- and he's not a minor at this time -- that the Government

8   was able to identify.  I spoke to the child's father.  I didn't

9   think that there would be any greater evidentiary value in the

10  child's testimony in the -- in this victim's testimony, given

11  his father's description to me of the child's present mental

12  status, which I described in an earlier filing with this Court.

13           I didn't think that either direct examination or

14  cross-examination would be more productive than the report we

15  have here from the time.  It was contemporaneous with a

16  complaint of abuse, and I thought it would be detrimental

17  potentially to the health of this child, now an adult.

18           As far as the corroboration of other allegations of

19  the defendant's characteristics and tendency of violence towards

20  women and children, Exhibit 4 in the notebook that I have given

21  the Court is another -- is another police report, this one from

22  the San Bernardino County Sheriff's Department that I previously

23  submitted to the Court and provided to counsel.

24           On review of this report, there is no suggestion that

25  the -- Ms. Chadwick is at all involved in the reporting of this

violence.  On Page 3, in fact, the police go and do their own

investigation, and it turns out that the defendant is lying to

them, and that the balance of factors appears to credit the

story of the victim.  And, again, this is -- this has nothing to

do with Ms. Chadwick.

Also Exhibit 5.  This is a report by the Los Angeles

Police Department relative to the victim's arrest.  There is no

suggestion that Ms. Chadwick had ever had anything to do with

this, but we do have here an indication that or a description of

the defendant's use of -- use of a walking cane to beat a

homeless woman in the head, swinging it with both hands, hitting

her at least five times.  There is some photographs of her

injuries, which are not attached.  This was the assault with the

deadly weapon that when the defendant was arrested, he

misidentified himself as -- by his brother's name, Roy DeWitt.

And when his fingerprints were run at the Los Angeles jail --

I'm not sure if he was booked at Twin Towers or at Parker

Center, but they realized that he, in fact, is -- his true

identity and handed him over to ICE, together with -- and I may

be bleeding over into another area, so I'm prepared to sit down.

Together with false identity, which is Exhibit 9 --

and I apologize to the Court that the last -- from 8, 9, 10, 11

and 12 I don't have separate tabs.  Our office was dismissed

early because of the protests on Friday, Your Honor.

Exhibit 9 is the false California's driver's license

```
 1    that the defendant was carrying at the time of his arrest by
 2    LAPD.  This is in the possession of ICE at moment.  The Court
 3    will see that the defendant has disguised his appearance and is
 4    using a false name, and there's a not even close to accurate
 5    looking social security card that defendant was carrying at the
 6    same time.
 7            Turning back to Page 2, Exhibit 8, this is a birth
 8    certificate for the defendant that looks like -- the Government
 9    would submit that this is evidence of the defendant's intention
10    to take on an entirely new identity.  You can see here that the
11    names are scratched out and that he has put in a new name and
12    some different information.  The fair inference from this, I
13    believe, is that he intended to obtain a complete set of
14    identification in this identity of Thomas Gibson Crown and then
15    to remain a fugitive in that identity.  This was at a time when
16    the defendant was -- had been on the run for some time at
17    some -- and had taken some significant steps to conceal his
18    whereabouts, including involving his parents in the attempt to
19    conceal his -- where he was and to make statements to the
20    Government, false statements to the Government, relative to
21    that.
22            I can elaborate on that.  The defendant had provided
23    his parents with a letter to be given over to the Government
24    which indicated, you know, that he was in another country and
25    that, you know, they shouldn't come to look for him.  It's not
```

1    very good, Your Honor, but it does show some -- some really

2    pernicious intent on the part of the defendant.  It's not

3    something that seriously duped ICE, and for that reason I'm not

4    arguing for an obstruction of justice enhancement based on him

5    being a fugitive, but it's darn close, when you look at

6    everything together.

7            I'll continue through the book.

8            Exhibit -- actually I'm going to jump to the back.

9    Exhibits 11 and 12 are two recipes for GHB, which is gamma --

10   well, I won't try and pronounce it.  These were found in the

11   defendant's bedroom.

12           Let me back up for just a minute.

13           THE COURT:  Those are the date-rape recipes, the

14   recipes for the date-rape --

15           MR. AKROTIRIANAKIS:  It is, Your Honor.  The legal

16   purpose incidentally of GHB, as the Court may be aware, is body

17   building.  Given the defendant's claimed physical condition, I

18   don't think this was being used to that end.

19           But in any event, GHB is a date-rape drug.  These

20   appear to have been downloaded from the Internet.  They were

21   found in the defendant's belongings in his residence, and

22   Ms. Chadwick is not alleged to have done anything relative to

23   these documents.  So we can put to rest forever the issue about

24   whether it was the defendant's residence or not.  He stipulated

25   in the Plea Agreement that it was his residence.

1          Turning to Exhibit 10, Your Honor, these are the

2    photographs.  This is the defendant's bedroom at the residence

3    where the -- where the child pornography was found.  The Court

4    sees on the first page the computer and on the right side an

5    armoire and further to the right of that, a bed.  The next

6    picture is the armoire opened, and there is an arrow drawn

7    there.  This is a pregnancy test, home pregnancy test that was

8    found in the defendant's possession at the time -- at the time

9    of the search.  I am not trying to make the world out of this,

10   but the defendant was interviewed at that time and didn't claim

11   to be in any adult relationship, married or dating or otherwise.

12          The next photograph is a closer shot of the pregnancy

13   test, and what the Court can also see is the mail in the

14   defendant's name, Kirk DeWitt, and the next -- the next picture

15   is more mail in the defendant's name showing indicia of

16   ownership of the bedroom in which the child pornography was

17   found, again, to lay to rest that document -- that contention

18   about whether or not it was, in fact, the defendant's bedroom.

19          And on this page, that has the picture of the camera

20   and the different Bank of America statements -- incidentally,

21   these Bank of America statements show that the defendant's

22   account was used to purchase the subscription to the child

23   pornography website that is at issue in this case.

24          But laying beneath all these, the Court sees another

25   of the jurisdictional dispositional reports from the Juvenile

1    Court file, that being the court file in the matter where the

2    defendant was ordered not to have any unsupervised visits with

3    his daughter.  The defendant's own mother, of course, admitted

4    that the defendant was in violation and that she was permitting

5    him to be in violation of the court orders in this case.

6            The next picture is email printed from Yahoo showing

7    the defendant's email address and on and on.

8            If I can refer the Court briefly to Exhibit 6, just

9    because it's something that counsel brought up, again, this is

10   the 1994 report.  On Page 3 we, of course, have the indication

11   from Ms. Chadwick of the defendant's particular assault on her

12   and how -- and she was five months pregnant at the time,

13   incidentally, and that she required surgery to correct that

14   condition.  She also complained of abuse -- and this is on

15   Page 4 -- of the defendant's minor child.

16           But moving on to Page 5 is I think what addresses the

17   point that counsel is trying to make here.  In the large

18   paragraph, it's the first full paragraph on the page, this is a

19   complaint which appears to have originated from the defendant's

20   mother.  It says, "In the report, it is stated that the

21   father" -- that's the defendant -- "allegedly would not attend

22   to the minor and told the minor to shut up" -- this is a

23   two-year old, Your Honor -- "and when the paternal grandmother

24   got up to feed" -- and I should say that like on the date of

25   this report, the minor turned two, so she was actually younger

1    than two at the time of the events that are related here.  "When

2    the paternal grandmother got up to feed and change the baby, the

3    father got mad and took the baby away from paternal grandmother

4    and then proceeded to shove her," I believe referring to his

5    mother.

6            The next report or the next paragraph also does not

7    mention that Maria Chadwick is the complainant.  Going over to

8    Page 6, the first full paragraph which is on the bottom half of

9    the page, here the complainant is a social worker at a Center

10   Against Rape and Domestic Violence.  It's a shelter where the

11   defendant's former cohabitant and the mother of his minor

12   daughter apparently was living at that time.  Here again, the

13   complainant is not Maria Chadwick.  This is a social worker who

14   observed -- it says, the name of the person, "stated what

15   prompted the exams was the minor's behavior, which included

16   humping dolls and stuffed animals.  After both exams, the first

17   being by a female doctor and the second by a male doctor, the

18   minor stated 'daddy'."

19           Going over to the next page again, they refer to the

20   report of the doctor who examined the child.  This is not a

21   complaint by Maria Chadwick.  And, again, there is the minor

22   child, the male, the six-year old boy in Oregon is the next

23   complainant who's whose referred to here.

24           Going over to Page 8, again we have a referral from --

25   this one appears to be from the -- from the paternal

1   grandmother, at least one of them is a complaint from the

2   paternal grandmother, of an early sexualization of the child.

3   That the child was acting as described she was --

4           THE COURT:  You know, Mr. Akrotirianakis, I know you

5   want to make the record, but I've read all of this.  In fact, I

6   stated earlier that a lot of this is the basis for my --

7           MR. AKROTIRIANAKIS:  And my only point then,

8   Your Honor, is that this is not all the complaints of somebody

9   who has an ax to grind with the defendant.

10          THE COURT:  Leaving aside some of the reports that

11  Mr. Aquilina referred to which came from Ms. Chadwick, there is

12  an abundance of evidence here from others that's more than

13  sufficient to satisfy -- that provides the support for the

14  Court's concerns on the 3553(a) factors about danger to the --

15  fashioning a sentence that reflects the further danger to the

16  community, protecting the community from this defendant, and so

17  forth, and it's the type of -- I don't mean to cut you off, but

18  it is exactly the sort of thing that really has nothing to do

19  with the -- well, I'm not saying nothing, but the fact that

20  there is an unhappy breakup doesn't -- it may mean there is a

21  need for maybe a greater degree of corroboration, but there is

22  plenty of that here in these reports, where they are sometimes

23  called a gracious plenty.  There is just an abundance of

24  evidence here.  It has nothing to do with any doubts about the

25  reliability of Ms. Chadwick's evidence.

1          MR. AQUILINA:  Your Honor, if I can conclude my

2    remarks in regard to these documents.

3          What I referenced with Ms. Chadwick was in reference

4    to her.  However, even the last commentary that counsel

5    referenced is a social worker spoke with a doctor who spoke with

6    at least one other person, and now the CPS worker is compiling

7    all of this material.  There are so many levels of hearsay here

8    that that alone should call into question the issue of

9    reliability.  But I'll submit it.

10         THE COURT:  Let me just say in response to that that

11   there -- well, that is an accurate characterization of certain

12   of the evidence in the reports.  I just want to make it very

13   clear that the evidence that was most persuasive to the Court is

14   not that.  It's the evidence that is taken directly from the

15   statements of the minor or the behavior of the minor, and that

16   comes from several different sources.  The behavior of the minor

17   when she was very young; the statements of the grandmother who

18   turned both reports -- reported directly to the social worker;

19   the fact that, as stated in the second report, there was a

20   finding by the Juvenile Court that the sexual and physical abuse

21   of the minor is what led the Court -- the Juvenile Court to find

22   that the guardianship should be taken from the father and placed

23   in the paternal grandparents; and it's also undisputed, I think,

24   or the evidence is very strong here that the defendant violated

25   the order of the Court and had unsupervised contact with the

1 | minor.

2 | So there are some -- some of the evidence that has

3 | been relied upon is less, perhaps, reliable because it goes

4 | through several sources of hearsay, but there is plenty of

5 | evidence that is fairly direct that the Court has relied upon to

6 | support the finding that there is -- and this is only one

7 | factor -- I mean, the 3553(a) factors -- that there is a need to

8 | protect the public.

9 | MR. AQUILINA:  If I could similarly address the other

10 | factors in summary of some of the evidence not only of what did

11 | occur but what did not.

12 | The Probation Office has, in regard to the current

13 | offense -- the Probation Office -- officer computed just over

14 | 3,000 images, and the Court indicated that the Court has heard

15 | cases of many less images, as low as a hundred, perhaps, and

16 | certainly the Court is in a better position than I am, hearing

17 | these cases on a regular basis, to asses this case with the

18 | others, as the Court has indicated, but I am also aware of cases

19 | with thousands and thousands and maybe hundreds of thousands of

20 | images.

21 | Also I think what needs to be highlighted in regard to

22 | the images that Mr. DeWitt possessed is none of them were on his

23 | computer.  They were all copied onto DVDs.  Many of them were

24 | compressed, which indicates that in all likelihood they were

25 | never opened.

1          THE COURT:  Well, I am glad you brought that up

2     because you made that argument in your papers.  That is an

3     inference that -- you see, when I hear that something is being

4     kept in a compressed or a zip drive, I draw the opposite

5     inference.  I think maybe it's either equally supportable, but

6     my experience has been on these cases when they are kept in that

7     form, it's because there tend to be so many that they -- that

8     defendant compresses them to have more space.

9          MR. AQUILINA:  I can't disagree.  That's one

10    inference, and I think the inference I have raised is the

11    second, obviously contradictory.  And I guess when we go to

12    Staples and we buy 500 CDs or DVDs at a time, I don't know how

13    much need there is to compress these movies.

14          But certainly the Court's inference is one that can be

15    accepted.  I think the one that I have presented is reliable as

16    well.

17          Also I don't think that there is any evidence

18    whatsoever of distribution by Mr. DeWitt.  There is certainly no

19    evidence that he created these images or these movies.

20          THE COURT:  But he would be facing a different charge,

21    a different maximum sentence, a different set of guidelines as

22    the starting point if that were the case.

23          MR. AQUILINA:  I understand.  But there is also those

24    individuals that distribute that are only charged with

25    possession, but I don't believe that there is any indication of,

1  contrary to what the Court's going to say, Mr. DeWitt being a

2  predator or pedophile.

3          I think the Court, as indicated, should consider his

4  health situation, that he's disabled, that he has been

5  permanently -- I won't say permanently but much more

6  significantly disabled and unable to use his lower extremities

7  since the date of his arrest, and I'm not placing the blame on

8  anyone or any institution, but obviously being in a facility

9  locked up does not assist in remedying his situation, and

10  certainly an extended period of incarceration is not going to

11  help in that regard either.

12          It's our contention that should Mr. DeWitt be

13  sentenced to the period of custody that we recommended and

14  suggested, that would be a sufficient deterrent, especially in

15  light of the supervised release period following that, and we

16  are objecting to the recommendation for lifetime period of

17  supervised release, along with the conditions under which he

18  would be released, along with the ultimate condition which is

19  sexual registration for life.

20          So based upon all of those, I'm asking the Court to

21  reconsider its indicated ruling and grant an order and judge the

22  defendant as recommended by the Defense.

23          And in regard to Mr. DeWitt's placement, it's

24  requested a placement facility to accommodate his medical and

25  physical needs as close to Southern California as possible to

1    accommodate his elderly parents, his father, who is present, as

2    well as his daughter, who is much older now and is also present

3    before the Court, and that's the request, as well as the

4    defendant's mother.

5              THE COURT:  Mr. Aquilina, on the issue of the

6    conditions, weren't most of those -- well, were most of those --

7    I thought most of those, if not all of those, were

8    stipulated to in the Plea Agreement in this case.  Am I wrong?

9              MR. AQUILINA:  Your Honor, I'm not disagreeing with

10   the conditions.  I'm saying under those conditions, the

11   likelihood of Mr. DeWitt -- I'm not objecting.

12             THE COURT:  You're not objecting to the conditions?

13             MR. AQUILINA:  Not at all.

14             THE COURT:  I misunderstood you.  Thank you.

15             Mr. DeWitt, do you wish to speak today?  You have the

16   right to speak, to allocute.

17             (Defendant and counsel confer off the record)

18             THE DEFENDANT:  I would not like to make a statement

19   at this time but only to one small degree.  I was only doing an

20   investigation, verifying.  I have been lied to by cops, state

21   employees, county employees, railroading.  My own mother's

22   statements to the fact, gestapo, and she is a survivor of Nazi

23   Germany.  I am a child of a survivor.  When she says gestapo,

24   she means that's exactly what she sees.

25             I wouldn't have gone looking for that if I wouldn't

1    have been shown.  Would never have had it.

2         In regards to my daughter, one time.  It was an

3    emergency.  Yes, it was wrong.  I even told the officer that he

4    was wrong.  Over 10 years of being in custody with my mother --

5    one time.  Accidents happen.  She is here to testify on my

6    behalf.

7         I'm sorry for all this occurring.  I would never have

8    gone looking for it if I wouldn't have been shown what I was

9    shown.  I'm very sorry for even having to be here and wasting

10   your time.  Thank you.

11        THE COURT:  This is not a waste of my time.  No case

12   is a waste of my time.  It's my responsibility, and it's not a

13   waste of my time.

14        Did you have anything else that you wish to say?

15        (Defendant confers with counsel off the record)

16        THE DEFENDANT:  In regards to the evidence that he has

17   given, in regards to my ex, to my daughter and so on and so

18   forth, that can all be proven as being false.  He's an attorney.

19   He is very good with his words.  I'm not.  What I see being done

20   is wrong.  While I have been incarcerated and all my life, I

21   have fought for other people.  The Board of Supervisors

22   meetings, for other people.  Helped other people in regards to

23   having problems with their families.  Help them out teaching

24   them.  That's what I have done in prison.

25        What I have gotten at MDC is threats against my life,

1  by CO, staff.  All over -- never mind.  It's a waste.  Thank

2  you.

3           THE COURT:  I will listen to you if there is anything

4  else that you would like to say.  But I want the record to be

5  very clear -- and I hope that you understand it -- you're not

6  being sentenced today -- there has been a lot of discussion

7  about things other than the crime for which you are being

8  sentenced.  And the most important thing here and the most

9  important factor is the crime that you pled guilty to, and

10 that's the crime for which you are being sentenced.

11          The discussion that -- there has been a lot of time

12 spent today talking about the other acts in the past.  That's a

13 very small factor in the Court's consideration.  One of the

14 factors the Court looks at, as well as looking at many, many

15 other factors, has to do with the need to protect the public,

16 but that's only one factor.  And the focus is on the crime that

17 you are convicted of and you stand convicted of and that you

18 pled guilty to, and that's the crime of possession of child

19 pornography, the nature of the pornography, the amount of it and

20 so forth.  That's the major focus of the Court's decision.

21          So although there has been a lot of discussion about

22 things that happened a long time ago, that is not what you're

23 being sentenced for.  You are being sentenced for what you are

24 being convicted of in this case, possession of child

25 pornography.

1          Mr. Aquilina, I know your client can't stand, but if

2    you would stand at the lectern and if you client could move over

3    so I can see his face.

4          THE DEFENDANT:  I am not attesting to the fact that I

5    had possession of.  To a point of that one discretion, taking my

6    daughter to school three blocks away, that's 15 years of

7    nothing.  Not a parking ticket.  Nothing.

8          THE COURT:  Well, Mr. DeWitt --

9          THE DEFENDANT:  Like an orderly, law-abiding citizen,

10   unless you want to take into effect standing in front of a Board

11   of Supervisors, arguing over illegal rights of stealing

12   somebody's land or in regards to Children's Services, being

13   illegal --

14         THE COURT:  No one is criticizing you for that.

15         THE DEFENDANT:  15 years, nothing.

16         THE COURT:  But --

17         THE DEFENDANT:  But a law-abiding citizen.  In regards

18   to everything, I was defending my life.  In the news, no more

19   than eight months ago, that same street, a gentleman burned to

20   death because somebody wanted his shoes.  That's how deadly that

21   street is.

22         She was 300 pounds.  I'm hobbling around with a cane

23   at that time.  I'm lucky I survived.  Before that, another

24   gentleman was burned alive in a porta-potty.  That's how deadly

25   that street is.  That should put the police department on that

1   street, and it still hasn't occurred, if you understand what I'm

2   saying.

3           THE COURT:  Any legal cause why judgment should not

4   now be imposed?

5           MR. AQUILINA:  No, Your Honor.

6           MR. AKROTIRIANAKIS:  No, Your Honor.

7           THE COURT:  All right.

8           The Court has considered the sentencing factors set

9   forth at 18 United States Code Section 3553(a) and the advisory

10  Sentencing Guidelines and hereby imposes a sentence as follows:

11          It's ordered that the defendant shall pay to the

12  United States a special assessment of $100, which is due

13  immediately.  All fines are waived as it is found that the

14  defendant does not have the ability to pay a fine.

15          Pursuant to the Sentencing Reform Act of 1984, it's

16  the judgment of the Court that the defendant, Kirk Karl DeWitt

17  is hereby committed on Count 1 of the Indictment to the custody

18  of the Bureau of Prisons to be imprisoned for a term of

19  120 months.

20          Upon release from imprisonment, he shall be placed on

21  supervised release for a term of life, under the following terms

22  and conditions:

23          He shall comply with the rules and regulations of the

24  U.S. Probation Office and General Order 318.

25          During the period of community supervision, he shall

1  pay the special assessment in accordance with this judgment's

2  orders regarding such payment.

3      He shall not obtain or possess any driver's license,

4  social security number, birth certificate, passport or any other

5  form of identification in any name other than his true legal

6  name, nor shall he use for any purpose or in any manner any name

7  other than his true legal name without the prior approval of

8  Probation.

9      He shall not be employed in any position that requires

10  licensing or certification by any local, state or federal agency

11  without prior approval of Probation.

12      He shall cooperate in the collection of a DNA sample

13  from the defendant.

14      The defendant shall possess and use only those

15  computers and computer-related devices, screen user names,

16  passwords, email accounts and Internet Service Providers which

17  have been disclosed to Probation at the beginning of

18  supervision.  Any changes or additions are to be disclosed to

19  Probation before the first use.  Computers and computer-related

20  devices are personal computers, Personal Data Assistants,

21  Internet appliances, electronic games, cellular telephones, and

22  digital storage media, as well as their peripheral equipment

23  that can access or can be modified to access the Internet,

24  electronic bulletin boards and other computers.  All computers,

25  computer-related devices, and their peripheral equipment used by

1    the defendant shall be subject to search and seizure.  This

2    shall not apply to any items used at his employment site which

3    are maintained and monitored by the employer.

4          He shall be subject to the installation of monitoring

5    hardware and software and shall pay the cost of the computer

6    monitoring in an amount not to exceed $30 per month per device

7    connected to the Internet.

8          He shall comply with the rules and regulations of the

9    computer monitoring program and pay the cost of the computer

10   monitoring program in an amount not to exceed $30 per month per

11   device connected to the Internet.

12         The defendant shall submit to a search at any time

13   with or without warrant and by any law enforcement or probation

14   officer of the defendant's person and any property, house,

15   residence, vehicle, papers, computer, other electronic

16   communication or data storage devices or media and effects upon

17   reasonable suspicion concerning a violation of a condition of

18   supervision or unlawful conduct by the defendant or by any

19   probation officer in the lawful discharge of the officer's

20   supervision functions.

21         He shall register as a sex offender and keep the

22   registration current in each jurisdiction where he lives, where

23   he is an employee, and where he is a student to the extent the

24   registration procedures have been established in each

25   jurisdiction.  When registering for the first time, he shall

1  also register in the jurisdiction in which the conviction

2  occurred if that is different from his jurisdiction of

3  residence.

4       He shall provide proof of registration to Probation

5  within three days of release from imprisonment.

6       He is to participate in a psychological counseling or

7  psychiatric treatment or sex offender treatment program as

8  approved and directed by Probation and shall abide by all rules,

9  requirements and conditions of such program.

10      The probation officer shall disclose the Presentence

11  Report or any previous mental health evaluations or reports to

12  the treatment provider, but the provider may not re-disclose any

13  such reports without the specific permission of the sentencing

14  judge.

15      As directed by Probation, he shall pay all or part of

16  the cost of treating any psychological or psychiatric disorder

17  to the after-care contractor during the period of supervision

18  pursuant to 18 United States Code Section 3672 and provide

19  payment and proof of payment as directed by Probation.

20      The defendant shall not possess any materials,

21  including pictures, photographs, books, writings, drawings,

22  videos or video games depicting, describing or constituting

23  child pornography as defined in 18 United States Code Section

24  2256(8).  This condition does not prohibit the defendant from

25  possessing any materials solely because they are necessary to

1    and used for a collateral attack on the conviction, nor does it

2    prohibit him from possessing materials prepared or used for the

3    purposes of his court-mandated sex offender treatment where the

4    defendant's treatment provider or the probation officer has

5    approved of his possession of the materials in advance.

6         The defendant shall not own, use or have access to the

7    services of any commercial mail receiving agency nor shall he

8    open or maintain a post office box without the prior approval of

9    Probation.

10        He shall not associate or have verbal, written,

11   telephonic or electronic communication with any person under the

12   age of 18 except, A, in the presence of the parent or legal

13   guardian of said minor, and, B, on the condition that the

14   defendant notify said parent or legal guardian of the

15   defendant's conviction in the instant offense.  This provision

16   does not include persons under the age of 18 such as waiters,

17   cashiers, ticket vendors, etc., with whom the defendant must

18   deal in order to obtain ordinary and usual commercial services.

19        The defendant shall not affiliate with, own, control,

20   volunteer or be employed in any capacity by a business or

21   organization that causes him to regularly contact persons under

22   the age of 18, and his employment shall be approved by the

23   Probation Office, and any change of employment must be

24   pre-approved by Probation.  He shall submit the name and address

25   of the proposed employer to the Probation Office at least

 1    10 days before any scheduled change.

 2              Pursuant to 18 United States Code Section

 3    3553(a)(2)(D), the Court authorizes Probation to disclose the

 4    Presentence Report and any previous mental health evaluations or

 5    reports to the treatment provider in order to provide defendant

 6    with needed correctional treatment in the most effective manner.

 7    The treatment provider may provide information, excluding the

 8    PSR, to state or local social service agencies such as the State

 9    of California Department of Social Services for the purpose of

10    the client's rehabilitation.

11              And the drug testing conditions mandated by statute is

12    suspended based on the Court's determination that the defendant

13    poses a low risk of future substance abuse.

14              Mr. DeWitt, under the terms of the Plea Agreement that

15    you entered into in this case, you have given up most of your

16    rights to appeal your sentence, but I still have to inform you

17    about your appeal rights.

18              You have the right to file -- you may file a Notice of

19    Appeal.  You may ask the Clerk of Court to accept it for filing.

20    You may ask that you be allowed to file it without paying the

21    usual required fees, and if you decide to file a Notice of

22    Appeal, you must do so within 10 days of today's date.

23              Do you understand?

24              THE DEFENDANT:  Yeah.

25              THE COURT:  And the Court will recommend the defendant

1   be placed in a federal medical center in the Southern California

2   area.

3           MR. AQUILINA:  Thank you, Your Honor.

4           THE COURT:  Anything else?

5           MR. AKROTIRIANAKIS:  Yes, Your Honor.  I'm sorry to

6   rise again.  I need to make one thing clear that was left

7   unclear.

8           Looking now at the order for -- on the juvenile

9   records, the section that counsel pointed the Court to that

10  relates to "the following records may be disclosed" and it's

11  left blank, that's a part of the order that is used when the

12  child is deceased.

13          THE COURT:  I'm sorry.  I saw that.  The order is

14  completely filled out, and it says that "these records may be

15  submitted to the Court."  But they are now to be returned to

16  counsel, as I understand it.

17          MR. AKROTIRIANAKIS:  Yes, Your Honor.  Upon the

18  completion of the proceedings, counsel will return them to me or

19  to the Court for destruction.  I will destroy them.

20          THE COURT:  I think even the Court's copy is to be

21  returned, are they not?

22          MR. AKROTIRIANAKIS:  I submitted -- well, the part --

23  the one that is part of the Court's file I believe needs to

24  remain, although it is in camera --

25          THE COURT:  The one that's filed under seal -- I'm not

1    sure you gave us a courtesy copy of these.  If you did, I am

2    going to order that it be returned.

3            MR. AKROTIRIANAKIS:  Yes, Your Honor.  I will wait,

4    then.

5            THE COURT:  I will do a Minute Order directing you to

6    come and retrieve it.  So you don't need to wait around tonight.

7    I don't believe you submitted one.  I think it's just the

8    under-seal filing that was submitted.

9            MR. AQUILINA:  Yes, Your Honor.  That's right.

10   Because it was filed over the counter.

11           THE COURT:  Anything else?

12           MR. AKROTIRIANAKIS:  No, Your Honor.  Thank you.

13           MR. AQUILINA:  No, Your Honor.

14           THE COURT:  All right.  Thank you.

15

16           (Proceedings adjourned at 6:08 p.m.)

17                        CERTIFICATE

18

19      I hereby certify that pursuant to Section 753, Title 18,
     United States Code, the foregoing is a true and correct
20   transcript of the stenographically reported proceedings held in
     the above-entitled matter and that the transcript page format is
21   in conformance with the regulations of the Judicial Conference
     of the United States.

22

23

24   _____        _____
     Pamela A. Seijas, CSR No. 3593              Date
25   Official Reporter